IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:12-CV-53-BO

SLEP-TONE ENTERTAINMENT          )
CORPORATION,                     )
                                 )
            Plaintiff,           )
                                 )        **MEMORANDUM AND**
      v.                         )        **RECOMMENDATION**
                                 )
NONA POWERS, et al.,             )
                                 )
            Defendants.          )

    This case comes before the court on the motion (D.E. 94) by defendant Collin Yarbrough

("defendant"), pursuant to Fed. R. Civ. P. 56, for partial summary judgment. The motion was

referred to the undersigned for a memorandum and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B). (*See* D.E. 99). The motion has been fully briefed (*see* D.E. 95 to 97) and is ripe

for adjudication. For the reasons set forth below, it will be recommended that the motion be

denied.

## BACKGROUND

### I.    PROCEDURAL HISTORY RELATING TO PLAINTIFF AND DEFENDANT

    Plaintiff Slep-Tone Entertainment Corporation ("plaintiff" or "Slep-Tone") commenced

this action, naming over 20 defendants, in the Western District of North Carolina on 11 March

2011. (*See* Compl. (D.E. 1)). By order entered 7 February 2012, the Western District severed

the five defendants then remaining in the case for whom venue lay in this district and directed

that new cases be filed against them in this district. (*See* D.E. 51 at 9). Plaintiff filed the cases,

but this court ordered that the instant case proceed on the original complaint and that plaintiff file

dismissals in the individual cases. (*See* D.E. 68).

Following three unsuccessful motions by defendant to dismiss, filed both before and after the Western District's 7 February 2012 order,[1] defendant filed his combined answer to the complaint, a purported third-party complaint against David and Jennifer Price ("the Prices"), and counterclaims (D.E. 69) on 24 October 2012. On 28 November 2012, plaintiff filed a corrected version of its answer (D.E. 75) to the counterclaims. The same day, plaintiff filed a motion to strike the purported third-party complaint (D.E. 74), but an agreement was reached that the Prices be joined as counterclaim defendants and the motion was thereby mooted. (*See* D.E. 80 ¶ 3). On 13 December 2012, defendant filed amended counterclaims (D.E. 79), which included the Prices. The Prices had filed an answer (D.E. 78) to the third-party complaint, but neither they nor plaintiff has filed an answer to the amended counterclaims.

## II.    FACTUAL BACKGROUND

Plaintiff, which is based in the Charlotte, North Carolina area, manufactures and distributes karaoke accompaniment tracks sold under the name "Sound Track." (*See, e.g.*, Am. Countercls. ¶¶ 3, 12; Compl. 2; ¶ 5). Plaintiff provides the tracks in the form of discs, in either CD+G (*i.e.*, compact disc plus graphics) or MP3+G (*i.e.*, MP3 plus graphics) format. (*See, e.g.*, Am. Countercls. ¶¶ 12, 25; Kurt J. Slep Decl. ¶ 7).

Defendant is employed in the business of hosting karaoke events, that is, serving as a karaoke jockey, at bars, restaurants, and other locations in the Raleigh-Durham, North Carolina area. (Am. Countercls. ¶ 7). He also provides wedding disc jockey and other similar services. (*Id.*). Defendant began his business in 2006 by buying equipment and music from his former employer, including karaoke discs. (*Id.* ¶ 8). He has since built up his collection, which includes, according to him, about 175 of plaintiff's compact discs. (*Id.* ¶¶ 9, 10).

---

[1] *See* D.E. 20 (denied in D.E. 37); D.E. 46 (denied in D.E. 51); D.E. 59 (denied by oral order noted at D.E. 68 and in the following minute entry).

Defendant alleges that he maintains his collection of plaintiff's music on the original discs and a hard drive, and has used the hard drive to provide commercial services. (*Id.* ¶ 28). Use of a hard drive avoids the burdens associated with handling numerous discs at a performance. (*See* Slep Decl. ¶ 9).[2]

Since before 2010, plaintiff has had a policy on media-shifting whereby it would not sue a host for infringement for copying songs from a disc onto a hard drive and using the hard drive in performances if certain requirements were met. (Am. Countercls. ¶¶ 21-25). In 2010, plaintiff purportedly started a program based on this policy, called the "Sound Choice Verified Compliance Safe Harbor Program." (*Id.* ¶ 24). It also arranged for the establishment of a website of the same, including a "How to Stay Legal" page, which presents information on plaintiff's media-shifting policy. (*Id.* ¶ 24-25).[3] Defendant alleges that these developments occurred around April 2010. (*Id.* ¶ 24).

Defendant alleges that before July 2010, plaintiff's media-shifting policy, as represented on the Safe Harbor website, required simply that for every song on a hard drive a host had to own an original disc containing that song. (*Id.* ¶ 23). He further alleges that he maintained such one-to-one correspondence in his collection and thereby was in compliance with plaintiff's media-shifting policy. (*Id.* ¶ 28).

---

[2] *See also* Safe Harbor website (as identified in footnote 3) 1.

[3] A copy of the "How to Stay Legal" page is attached as Exhibit A to defendant's counterclaims and is referred to herein as "Safe Harbor website." (Defendant refers to this page as the "Staying Legal" page, apparently in reference to the name of the link for it shown on the page itself.) Although the last sentence on page 1 of that exhibit and the first sentence on page 2 are partially cut off, the obscured language appears to be reproduced in Am. Counterclaims ¶ 25, which sets out a purportedly verbatim excerpt from the Safe Harbor website.

Defendant does not allege expressly that the version of the website appearing in the Safe Harbor website exhibit and paragraph 25 of the amended counterclaims is the same version upon which he purportedly relied. But that is implied by paragraph 25 and by defendant's focus on this language, particularly when considered in the light most favorable to plaintiff, as required. The same implication is evident in defendant's memorandum. (*See* Def.'s Mem. (D.E. 95) 8-10). Notably, defendant does claim in his memorandum that the Safe Harbor website was changed (to describe more fully plaintiff's media-shifting policy), but only after the deposition of Slep, which occurred on 13 June 2013. (*Id.* at 10 n.2).

Defendant contends that plaintiff changed its media-shifting policy in July 2010 to require prior notice to it of a shift in media, an audit, and issuance of a covenant-not-to-sue document. (*Id.* ¶ 27). Plaintiff purportedly added a page to its principal website· providing information on the policy adopted in July 2010. (*Id.*).

Investigators acting on behalf of plaintiff or its agents attend events hosted by karaoke jockeys to gather information on whether they are infringing on plaintiff's trademarks. (*See* Am. *Id.* ¶¶ 48-53). Jennifer Price is allegedly one such investigaor, and she and her husband, David Price, are allegedly competitors of defendant. (*Id.* ¶ 48). David Price purportedly settled with plaintiff after being sued by it for trademark infringement. (*Id.*). On 5 February 2011, Jennifer Price conducted undercover surveillance of an event hosted by a person working for defendant. (*Id.* ¶ 49). Her report indicates that two of plaintiff's songs were played and that plaintiff's logo was displayed during at least one song. (Price Rep. (D.E. 69-2 at 10-14) 1, 2 (attached as part of Ex. B to Countercls.)). Defendant alleges that in April 2011 David Price told a Raleigh bar that defendant was operating illegally and that soon thereafter the bar terminated the agreement it had with defendant. (Am. Countercls. ¶ 77). Another individual who investigated defendant, whose report defendant also filed, is David Millius ("Millius"). (Millius Rep. (D.E. 69-2 at 2-9) (attached as part of Ex. B. to Countercls.)).

Defendant alleges that in July 2010, after hearing of mass infringement suits by plaintiff, he contacted plaintiff to arrange an audit of his music collection. (Am. Countercls. ¶ 55). He was directed to plaintiff's then Raleigh, North Carolina counsel, Andrew Fine ("Fine"), to discuss a settlement. (*Id.* ¶ 56). Fine subsequently mailed to defendant a complaint bearing a caption for the Western District of North Carolina alleging trademark infringement against defendant and 17 others. (*Id.* ¶ 57; Draft Compl. (D.E. 69-3) (attached as Ex. C to

4

Counterclaims)). According to defendant, no correspondence or other communication accompanied the complaint. (Am. Countercls. ¶ 57). Defendant later determined with the assistance of counsel that the complaint had not been filed and bore the case number of a prior case. (*Id.* ¶ 58). Defendant had his lawyer inform Fine that he would not settle because there was no case. (*Id.*).

## III. PARTIES' CLAIMS

In its complaint, plaintiff asserts claims against defendant for trademark infringement under 15 U.S.C. § 1114 (Compl. ¶¶ 133-39) based on commercial use of unauthorized copies of plaintiff's works and display of its trademarks; unfair competition under 15 U.S.C. § 1125(a) (*id.* ¶¶ 140-46); and violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq*. ("UDTPA") (*id.* ¶¶ 140-46).[4] The relief plaintiff seeks includes a permanent injunction, defendant's profits from the alleged infringement, its own damages, treble damages, punitive damages, attorney's fees, and costs. (*Id.*, Prayer for Relief, 32-34).

Defendant asserts counterclaims for a declaratory judgment, pursuant to 15 U.S.C. § 1501 *et seq*., against plaintiff declaring that he did not infringe plaintiff's trademarks because plaintiff abandoned them by naked licensing through its media-shifting policy (Am. Countercls. ¶¶ 79-83); tortious interference with contract against plaintiff and David Price (*id.* ¶¶ 84-88); tortious interference with prospective economic advantage against plaintiff and David Price (*id.* ¶¶ 89-92); violation of UDTPA against plaintiff[5] (*id.* ¶¶ 93-101); violation of the North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C. Gen. Stat. § 75D-3(c)(1)(b), against

---

[4] The complaint refers to defendant specifically in paragraphs 25 and 117-19.

[5] Although this claim includes allegations of misconduct by the Prices (*see* Am. Countercls. ¶¶ 96, 97), certain essential elements are alleged only against plaintiff (*see id.* ¶¶ 100, 101; *Harty v. Underhill*, 211 N.C. App. 546, 552, 710 S.E.2d 327, 332 (2011) (listing essential elements of a UDTPA claim)) and relief appears to be sought only as to plaintiff (*see id.* ¶ 101). Even if the Prices were deemed defendants as to this counterclaim, defendant nowhere states expressly that his motion requests summary judgment against them, and he presents no argument to that effect, thereby abandoning any such request.

5

plaintiff (*id.* ¶¶ 102-10); and civil conspiracy against plaintiff and the Prices (*id.* ¶¶ 111-16). Defendant seeks, among other relief, a declaratory judgment, compensatory damages, treble damages, punitive damages, attorneys' fees, and costs. (*Id.* at 20).

## IV.   DEFENDANT'S SUMMARY JUDGMENT MOTION

By his motion, defendant seeks, in part, summary judgment dismissing all of plaintiff's claims. While the motion itself states that the relief sought is limited to summary judgment on "all of Plaintiff Slep-Tone's *infringement* claims" (Mot. 1 (emphasis added)), arguably all of plaintiff's claims are infringement related. In any event, defendant makes clear elsewhere that he seeks summary judgment on all of plaintiff's claims, irrespective of their nature. (*See, e.g.*, Def.'s Mem. (D.E. 95) 18 (defendant seeks judgment "dismissing all of Slep-Tone's claims")).

In his memorandum, defendant states that he seeks this relief on behalf of all the defendants. (Def.'s Mem. 2, 18). But the other defendants have not made any filings on defendant's motion. While the ruling on defendant's motion could have implications for other defendants, the court deems defendant's motion as brought solely on his behalf.

As to his counterclaims, defendant's motion states that he seeks summary judgment on his UDTPA counterclaim. (Mot. 1). In his memorandum, defendant states that he also seeks a declaratory judgment for non-infringement (Def.'s Mem. 18), relief that is the subject of a separate counterclaim (*see* Am. Countercls. ¶¶ 79-83). Particularly in light of the close relationship between the dismissal of plaintiff's infringement claim and the declaratory relief defendant seeks, the court deems defendant to be seeking summary judgment on his declaratory judgment counterclaim as well as his UDTPA counterclaim.

In support of his motion, defendant submitted a memorandum supported by a purported affidavit by him (D.E. 95-1 at 1-7) (dated 30 July 2013; filed 6 Sep. 2013) with exhibits (D.E.

6

95-1 at 8-14) and the transcript of the Rule 30(b)(6) deposition of plaintiff's president, Kurt J. Slep ("Slep") (D.E. 95-2) (13 June 2013). Defendant also filed a reply memorandum (D.E. 97) supported by a second purported affidavit by him (D.E. 97-1) (dated and filed 17 Oct. 2013).

Plaintiff filed a single memorandum (D.E. 96) supported by a declaration by Slep (D.E. 96-1 at 1-5) (dated and filed 30 Sep. 2013) with an exhibit (D.E. 96-1 at 6-10) and a declaration by plaintiff's counsel of record in this litigation, James M. Harrington ("Harrington") (D.E. 96-2) (dated and filed 30 Sep. 2013).

Also relevant to defendant's motion are the exhibits (D.E. 69-1 to -4) attached to his original counterclaims. Although these documents were not attached to defendant's amended counterclaims, that pleading refers to the exhibits, and it is apparent that defendant intended them to be included with the amended counterclaims. (*Compare* Countercls. ¶¶ 25, 49, 57, 65 *with* Am. Countercls. ¶¶ 25, 49, 57, 65).

## APPLICABLE LEGAL PRINCIPLES

### I. SUMMARY JUDGMENT

Basic principles relating to summary judgment, provided for under Rule 56, have recently been summarized by this court as follows:

> A motion for summary judgment cannot be granted unless there are no genuine issues of material fact for trial. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate the lack of genuine issue of fact for trial and if that burden is met, the party opposing the motion must "go beyond the pleadings" and come forward with evidence of a genuine factual dispute. *Celotex*, [477] U.S. at 324. The Court must view the facts and the inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Conclusory allegations are insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.") (emphasis in original).

7

*Total Quality Logistics, LLC v. Frye Trucking, LLC*, No. 5:13-CV-136-BO, 2014 WL 407645, at
*1-2 (E.D.N.C. 3 Feb. 2014).

Summary judgment may be awarded for only certain claims or defenses or parts thereof
in a case. Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a]n affidavit or declaration used
to support or oppose a motion must be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant or declarant is competent to testify on the
matters stated." Fed. R. Civ. P. 56(c)(4).

## II. TRADEMARK INFRINGEMENT AND RELATED CLAIMS

A person may infringe a trademark for a work by copying or shifting it from its original
medium to another medium for commercial use without the trademark owner's consent and by
displaying the owner's trademark during a presentation of the shifted work without the owner's
consent. *See Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 819 (4th Cir. 2001) (holding that to
sustain a trademark infringement action under the Lanham Act, a plaintiff must prove "that it has
a valid, protectable trademark and that the defendant is infringing its mark by creating confusion,
or a likelihood thereof, by causing mistake, or by deceiving as to the attributes of its mark");
*Expressway Music, Inc. v. Slep-Tone Entm't Corp.*, No. 12CIV834, 2013 WL 5345969, at *2
(S.D.N.Y. 23 Sept. 2013) (denying motion to dismiss trademark infringement claim where
plaintiff claimed defendant allegedly acquired or made unauthorized duplicates of plaintiff's
karaoke tracks and used plaintiff's trade dress and mark on a copied product).

One defense to an infringement claim is abandonment of the trademark. A trademark
must be deemed abandoned "[w]hen any course of conduct of the registrant, including acts of
omission as well as commission, causes the mark to lose its significance as an indication of
origin." 15 U.S.C. § 1127(b). Abandonment may result from naked licensing.

8

*FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515-16 (9th Cir. 2010); *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075-76 n.7 (5th Cir. 1997); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F. Supp. 2d 612, 621 (E.D. Va. 2002). Naked licensing is the licensing of a trademark without the licensor's exercising quality control over the licensee's use of the mark. *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3d Cir. 1992); *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973).

Equitable estoppel is another possible defense to an infringement claim. 15 U.S.C. § 1115(b)(9); *see also Ray Comm'ns, Inc. v. Clear Channel Comm'ns, Inc.*, 673 F.3d 294, 300 (4th Cir. 2012). To establish estoppel, the party claiming it must show:

(1) the party to be estopped knew the true facts; (2) the party to be estopped intended for his conduct to be acted upon or acted in such a way that the party asserting estoppel had a right to believe that it was intended; (3) the party claiming estoppel was ignorant of the true facts; and (4) the misconduct was relied upon to the detriment of the parties seeking estoppel.

*Dawkins v. Witt*, 318 F.3d 606, 612 n.6 (4th Cir. 2003) (citation and internal quotations omitted).

A party asserting unfair competition under the Lanham Act must show, in addition to the validity and protectability of its trademark, that the opposing party's use of the mark is likely to cause confusion among consumers as to the source of the goods or services involved. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995); *see also Georgia Pacific Consumer Prods. v. Von Drehle Corp.*, 618 F.3d 441, 449 (4th Cir. 2010).

The following principles govern UDTPA claims:

The elements of a claim for unfair or deceptive [trade] practices in violation of N.C. Gen. Stat. § 75-1.1 (2003) are: (1) an unfair or deceptive act or practice or an unfair method of competition; (2) in or affecting commerce; (3) that proximately causes actual injury to the plaintiff or to his business. To prevail on a Chapter 75 claim, a plaintiff need not show fraud, bad faith, or actual deception. Instead, it is sufficient if a plaintiff shows that a defendant's acts possessed the tendency or

9

capacity to mislead or created the likelihood of deception. Although it is a question of fact whether the defendant performed the alleged acts, it is a question of law whether those facts constitute an unfair or deceptive [trade] practice. Under [N.C. Gen. Stat. §] 75-1.1, an act or practice is unfair if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. An act or practice is deceptive if it has the capacity or tendency to deceive. Under section 75-1.1, a mere breach of contract does not constitute an unfair or deceptive act. Egregious or aggravating circumstances must be alleged before the provisions of the Act may take effect.

*Harty v. Underhill*, 211 N.C. App. 546, 552, 710 S.E.2d 327, 332 (2011) (internal quotations and citations omitted).

## ANALYSIS

### I. SUFFICIENCY OF DEFENDANT'S EVIDENCE

There are numerous deficiencies in the evidence defendant submitted in support of his summary judgment motion. While his initial purported affidavit begins with the statement that he was "first duly [s]worn," the notarial certification does not show that the notary took his oath. Rather, the notary—defendant's counsel of record—indicates simply that defendant "acknowledged that he signed the foregoing document." (Def.'s 1st Aff. 7). Moreover, this language, using the past tense to describe execution by defendant, clearly suggests that defendant signed it prior to seeing the notary and therefore outside the presence of the notary. Accordingly, this purported affidavit does not constitute evidence admissible to support defendant's motion. *See Jones v. Vandevander*, No. 7:09CV00055, 2009 WL 4709561, at *8 n.2 (W.D. Va. 29 Decl. 2004) (citing *Lumoa v. Potter*, 351 F. Supp. 2d 426, 431 (M.D.N.C. 2004)). In one instance noted below, though, the court treats certain statements in the affidavit as admissions of a party opponent under Fed. R. Ev. 801(d)(2)(A) and relies on them in its analysis of why summary judgment is not warranted. *See, e.g., Pitrolo v. County of Buncombe, N.C.*, No. 07-2145, 2009

WL 1010634, at *2 (4th Cir. 11 Mar. 2009) (holding statement admissible as admission of party opponent on summary judgment motion).

Defendant's second purported affidavit fails as an affidavit per se because there is no notarial certification with it.[6] It does, however, contain language sufficient under 28 U.S.C. § 1746(2) to make it a declaration: "I hereby declare under penalty of perjury that the foregoing statements are true of my own personal knowledge . . . ." (Def.'s 2d Aff. 2). Defendant did not, though, manually sign this document. In lieu of his manual signature, the symbol "/s/" appears followed by his typed name. (*Id.*). With respect to documents calling for a single signatory, as here, the court's ECF Administrative Policies and Procedures Manual ("Manual") provides for use of the "/s/" only by attorneys. Manual § J(1). In that instance, the Manual states that the "user log-in and password required to submit documents to CM/ECF shall serve as that user's signature for purposes of Federal Rule of Civil Procedure 11 and for all other purposes under the Federal Rules of Civil and Criminal Procedure and the Local Rules of this court." *Id.* There are, of course, no such safeguards for a non-attorney party such as defendant. The court accordingly finds defendant's second purported affidavit to be unsigned and inadmissible.

Notwithstanding these deficiencies in his purported affidavits, defendant did submit substantial admissible evidence in support of his motion. In paragraph 3 of his first purported affidavit, he verified the facts stated in the amended counterclaims. He stated:

I have read the First Amended Counterclaim filed on my behalf in this action (including its exhibits) and declare under penalty of perjury under the laws of the United States of America that the facts contained therein are correct and true to the best of my knowledge and belief and that those factual matters that are stated upon information and belief are believed by me to be true.

(Def.'s 1st Aff. ¶ 3). The court therefore finds admissible the facts stated in the amended counterclaims, except for those stated on information and belief. *See* Fed. R. Civ. P. 56(c)(4).

---

[6] An unexecuted notarial acknowledgement dated 17 August 2013 is attached. (Def.'s 2d Aff. 3).

While, as indicated, the exhibits referenced in the amended counterclaims were not included with that pleading, the court will deem them to be attached and therefore authenticated as stated in the amended counterclaims.

The court notes that even if it were to treat defendant's affidavits as admissible, the information therein would not establish his entitlement to summary judgment because, among other reasons, the evidence that is admissible establishes genuine conflicts of material fact and the affidavits largely provide details on matters already addressed in the amended counterclaims. Admission of the affidavits would therefore not alter the recommended disposition of the motion.

Another deficiency relating to defendant's evidence is that, with one arguable exception,[7] all 19 of his citations to the Rule 30(b)(6) deposition of Slep in his memorandum are erroneous—that is, the testimony cited does not match at all or, in several instances, only partially, the description of it in his memorandum. (*See* Def.'s Mem. 3, 4, 5, 9, 10, 12, 15, 16, 17).[8] Although page 57 erroneously appeared after page 50 in the copy of the transcript filed with the court, this mistake does not account for the citation errors. In its discretion (*see* Fed. R. Civ. P. 56(c)(3)), the court attempted to determine the precise testimony intended to be cited, but was able to do so with certainty only with respect to the two instances where defendant quoted it (*see* Def.'s Mem. 10, 12).[9] Ultimately, again in its discretion, the court chose to review and consider the deposition in its entirety.[10] Because, among other reasons, the admissible evidence

---

[7] The one potential exception is the citation to 50:16 to 53:3 on page 4 of the memorandum.

[8] Numerous citations are to "Slep-Tone Aff.," but it is apparent that reference is to Slep's deposition, rather than Slep's declaration, because of the inclusion of citations to lines and the high page numbers referenced, exceeding the number of pages in the declaration. (Def.'s Mem. 15, 16, 17).

[9] The correct citation for the quotation on page 10 of defendant's memorandum is 91:9-11, 16-17 and for the quotation on page 12 it is 76:6-11.

[10] The court also notes that defendant cites one time to an exhibit to his own deposition, but defendant has not submitted a copy of it. (*See* Def.'s Mem. 10 (citing to "Yarbrough Dep. Ex. 13")).

that defendant did submit enabled the court to reach a determination regarding his motion, it elected not to take other action authorized by Rule 56(e) regarding the deficiencies in his evidence.

## II.    PLAINTIFF'S CLAIM FOR INFRINGEMENT

Defendant seeks summary judgment on plaintiff's infringement claim on the grounds of both naked licensing and equitable estoppel. Each ground is discussed in turn below.

### A.    Naked Licensing Defense

Defendant contends that plaintiff engaged in naked licensing through its pre-July 2010 version of its Safe Harbor website. Specifically, defendant argues that by the website, plaintiff granted a license to karaoke jockeys to shift plaintiff's trademarked works on disc to computer hard drives and to use the hard drive recordings commercially, provided they maintained a one-to-one correspondence between the discs owned and the works on the hard drive. While defendant argues that there are no genuine disputes as to any material fact on this question, the record shows to the contrary.

For example, the Safe Harbor website does not purport to grant a license. *But cf.* Cov.-Not-To-Sue Doc. (D.E. 96-1 at 7-10) 10 (stating "you may return this *License* agreement" by specified means (emphasis added)). Indeed, it states specifically, "For legal reasons, Sound Choice does not authorize the use of hard drive systems to play our karaoke music commercially." (Safe Harbor Website 1). Instead, it speaks of adherence to the media-shifting policy as resulting in an agreement by plaintiff not to sue. (*See id.*).

Further, the website states that its purpose is informational: "This site is designed to provide information about Sound Choice's policies, the laws of the United States regarding intellectual property, and the manner in which Sound Choice enforces its rights. This site does

13

not provide legal advice." (Safe Harbor Website 2). Thus, the website does not represent that it is an offer to enter into any kind of agreement or other legal relationship. Slep confirms in his declaration that the purpose of the website is informational and states further that it is oriented primarily to venues, not hosts: "The site is designed to provide information to venues about avoiding piracy and hiring karaoke hosts who supply pirated material for those shows, therefore exposing the venue to vicarious liability for infringement." (Slep Decl. (D.E. 96-1 at 2-5) ¶ 4). He testified to the same effect at his deposition. (Slep. Dep. 28:9-21, 100:20-23, 106:7-14, 118:11 to 119:17).

Additional language in the website is consistent with its having an informational purpose. For example, it states that "we *will* agree not to sue you for 'media-shifting' the contents of our CD+Gs or MP3+G discs if you follow our media-shifting policy." (Safe Harbor Website 1) (emphasis added). It does not say "we *do* agree."

The website also provides links for venues and hosts to sign up for the Safe Harbor program. (*Id.* at 2). The provision for signing up suggests that enrollment in the program is necessary to receive the benefits of the media-shifting policy.

Defendant alleges that plaintiff's one-to-one protocol required simply that for each track on a hard drive the host own an original copy of the disc containing the track (as well as deletion of hard drive tracks when there is not a corresponding disc). (Am. Countercls. ¶ 23). In fact, though, the Safe Harbor website itself states that one-to-one correspondence also requires that the disc not be used for any commercial purpose or, in the words of the website, that it be put "'on the shelf.'" (Safe Harbor Website 1-2; Am. Countercls. ¶ 25). At his deposition, Slep implicitly adopted the even more precise delineation of the one-to-one correspondence protocol set out in paragraph 39 of the complaint:

"One-to-one correspondence" requires (1) that each track stored on an alternative medium have originated from an original Sound Choice compact disc; (2) that the tracks from the original Sound Choice compact disc be shifted to one, and only one, alternative medium at a time; (3) that the KJ maintain ownership and possession of the original Sound Choice compact disc while its content is shifted to the alternative medium; and (4) that the original Sound Choice compact disc not be used for any commercial purpose while its content is shifted to the alternative medium.

(Slep Dep. 109:2 to 110:23).

There is also evidence contradicting the assumptions underlying defendant's position that all plaintiff's media-shifting policy required and all the website represented it as requiring was a host's compliance with a one-to-one correspondence requirement. (*See* Am. Countercls. ¶ 80). At his deposition, Slep testified that the media-shifting policy also required prior notification; certification, including an audit; and execution of a covenant-not-to-sue document. (Slep Dep. 91:7-21; *see also* Pl.'s Ans. to Countercls. ¶ 27 (admitting that media-shifting policy requires prior notification and an audit). That document imposes specific controls on what may be media shifted and authorizes plaintiff to perform further audits. (Cov.-Not-To-Sue Doc. (D.E. 96-1 at 7-10)). In his declaration, Slep also spoke of audits of hosts and their execution of a covenant-not-to-sue document as parts of the media-shifting policy (Slep Decl. ¶¶ 10, 11), pointing out the restrictions imposed by the document.

Slep additionally testified at his deposition that the information in the website about the media-shifting policy is simply, in effect, an introduction to it and not complete. (Slep Dep. 102:6 to 103:9, 106:7 to 107:20, 108:6-15). In his declaration, he states that the information in the website "is not and has never been intended as a complete statement of Slep-Tone's media-shifting policy." (Slep Decl. ¶ 5).

The website itself identifies plaintiff's program as the "Sound Choice *Verified* Compliance Safe Harbor Program." (Safe Harbor Website 1 (emphasis added); *see also* Am.

15

Countercls. ¶ 24 (using the same name for the program)). The clear indication is that the program entails verification by plaintiff and that self-compliance is not sufficient. Indeed, the website states that "[t]o determine one-to-one correspondence, *we* look at the other medium, usually a hard drive." (Safe Harbor Website 1 (emphasis added)).

Notably, defendant states that he relied on plaintiff's policy "as stated on [plaintiff's] Safe Harbor website *and similar websites or forums*." (Am. Countercls. ¶ 28 (emphasis added)). The statement raises the question of the extent to which defendant's purported reliance was based on representations made by third parties about plaintiff's policy, rather than by plaintiff.[11]

Defendant also contends that he shifted plaintiff's works from discs to a hard drive after plaintiff's purported launch of its Safe Harbor program around April 2010, but before July 2010. (Am. Countercls. ¶¶ 24, 28). Defendant admits that in July 2010 plaintiff added a page to its primary website regarding the terms and conditions of use of its trademarks and logos. (*Id.* ¶ 27). He further admits that as of July 2010, plaintiff's media-shifting policy required prior notification of plaintiff of an intended shift in media, an audit, and the execution of a covenant not-to-sue document, all steps defendant's allegations show he did not take. (*Id.*). Indeed, defendant admitted that he requested an audit in July 2010. (*Id.* ¶ 55).[12] These allegations substantiate that any naked licensing by plaintiff ended by July 2010. Thus, a fact central to defendant's contention of naked licensing is that he reviewed the Safe Harbor website prior to July 2010 and thereby before plaintiff's alleged addition to its main website about its media-shifting policy.

---

[11] Plaintiff's second affidavit purports to identify some of the websites that he reviewed. One was a forum that contained a cross-posted response "from Kurt Slep, or *someone claiming to be Kurt Slep*." (Pl.'s 2d Aff. ¶ 4 (emphasis added)). Two others purportedly contained links to the Safe Harbor website, but there is no representation that such links were proper and did not entail unauthorized access to that website. (*Id.* ¶¶ 5-6).

[12] Although the date alleged is "July 27, 2012," the context indicates that the intended date was "July 27, 2010."

16

But Harrington states in his declaration that the website was not publically available until 1 July 2010. (Harrington Decl. ¶¶ 1-3; *but cf.* Pl.'s Ans. to Countercls. ¶ 24 (admitting that defendant "launched" the website "in or around" April 2010)). He denies specifically that defendant could have reviewed the website in "early 2010"—as defendant claims he did in his first affidavit (Pl.'s 1st Aff. ¶ 13)—because the site was not accessible then. (Harrington Decl. ¶ 4). Harrington explains that he was in a position to know about the website because, as lead outside counsel for plaintiff, he was principally responsible for developing the media-shifting policy and the website for it. (*Id.* ¶ 2). Slep confirmed at his deposition that Harrington's firm maintains the Safe Harbor website, not plaintiff. (Slep Dep. 27:23 to 28:8).

Defendant alleges that plaintiff added the notification, audit, and covenant-not-to-sue requirements to its media-shifting policy in July 2010, thereby accounting for the fuller explanation of its policy on its main website. (Am. Countercls. ¶ 27). Slep, though, testified in his deposition that plaintiff probably started certification of disc collections, which includes an audit, in early 2009. (Slep Dep. 94:2-10). He further explained that "somewhat simultaneously with us filing the lawsuits, which first was in 2009, we introduced, if you will, the enumeration of the media-shifting policy" in the "FAQ" (*i.e.*, frequently asked questions) section of plaintiff's website. (*Id.* 94:11-20).

Further, Slep testified at his deposition and stated in his declaration that, absent compliance with the media-shifting policy, plaintiff prohibits media shifting. (*Id.*, *e.g.*, 92:5, 93:13-15, 98:11, 102:17-24; Slep Decl. ¶ 9). This evidence substantiates that, to the extent defendant did not review the Safe Harbor website in the April to June 2010 time frame, as he alleges, he was subject to the prohibition against copying.

Plaintiff's default prohibition against copying was manifested by its use of warnings against copying on the packaging for its discs and the discs themselves. Defendant admits to plaintiff's use of such warnings. Specifically, defendant acknowledges that the packaging of plaintiff's products typically contains a warning against reproduction for commercial purposes without plaintiff's consent, that CD+G or DVD discs themselves typically contain a similar warning, and that more recent CD+G releases include a package insert with such a warning. (Am. Countercls. ¶¶ 13, 15, 17; *see also* Slep Decl. ¶ 8 ("This warning [against unauthorized representation] has appeared on virtually every karaoke disc Slep-Tone has ever sold."). Defendant further admits that most of the discs by plaintiff he purchased had this packaging, almost all his discs themselves had the labeling, and the recent additions to his collection include the inserts. (Am. Countercls. ¶¶ 14, 16, 18).

Plaintiff's use of labeling is one of various efforts the evidence shows plaintiff took to protect its trademarks. As defendant admits, plaintiff or its agents also used investigations and "mass lawsuits against hosts for trademark infringement." (*Id.* ¶¶ 48-54). The Safe Harbor website itself references plaintiff's use of investigations: "[W]e have investigators visiting karaoke shows virtually every night of the year in an ever expanding number of cities." (Safe Harbor Website 2). The website also mentions the possibility of plaintiff suing (*id.* ("[Y]ou could be sued."), and there is a link entitled "About the Lawsuits" (*id.* at 1). The evidence of plaintiff's efforts to protect its trademarks tends to conflict with the notion advanced by defendant that plaintiff willingly allowed hosts to use its trademarked works on an unfettered basis.

The court concludes that there are genuine disputes as to numerous material facts regarding the alleged naked licensing by plaintiff. It will therefore be recommended that summary judgment be denied with respect to the naked licensing defense.

## B. Estoppel Defense

Defendant argues that by virtue of the representations in the Safe Harbor website plaintiff is estopped to deny that it permitted defendant to shift his discs to a hard drive and use the hard drive commercially. As the prior discussion illustrates, however, there are numerous genuine disputes as to material fact on this defense. These disputes include: whether the website set out all the terms of plaintiff's media-shifting policy; whether plaintiff intended karaoke hosts such as defendant to rely on the website as authorizing media shifting based simply on compliance with a one-to-one correspondence requirement; whether plaintiff or some third party made the representations about plaintiff's media-shifting policy upon which defendant alleges he relied; and whether defendant actually reviewed the website prior to July 2010 as he alleges and not in or after July 2010 when he admits he was aware of other requirements of plaintiff's media-shifting policy besides one-to-one correspondence. It will therefore be recommended that summary judgment be denied with respect to defendant's estoppel defense.

## III. PLAINTIFF'S CLAIMS FOR UNFAIR COMPETITION AND UDTPA VIOLATIONS

Defendant argues that plaintiff's claims for unfair competition and UDTPA violations fail because they presume that plaintiff had a valid, protectable trademark with respect to its works at issue and that the record establishes by virtue of the naked licensing and estoppel that it does not. Because, however, there are genuine disputes as to material fact relating to the naked licensing and estoppel defenses, there necessarily are genuine disputes regarding the unfair competition

and UDTPA claims. It will therefore be recommended that summary judgment be denied with respect to these claims as well.

## IV. DEFENDANT'S COUNTERCLAIM FOR DECLARATORY RELIEF

As noted, the court deems defendant to be seeking summary judgment on his counterclaim for a declaratory judgment that he has not committed trademark infringement against plaintiff. To the extent that his claim rests on the alleged unenforceability of plaintiff's trademarks, on either a naked licensing or estoppel theory, the prior discussion shows that there are genuine disputes of material fact that preclude summary judgment.

Even assuming the trademarks are enforceable, genuine disputes of material fact are presented. Defendant himself admits that he transferred plaintiff's works to hard drive and used the shifted works for commercial purposes. (Am. Counterclaims ¶ 28). In addition, Slep testified at his deposition that in late July 2010, after contact with Fine, he purchased 277 of plaintiff's discs, possibly signifying that he had not been in compliance with the one-to-one correspondence protocol and was attempting to give the appearance that he had been. (Slep Dep., *e.g.*, 73:20-21, 109:22 to 110:4). These disputes also preclude summary judgment on defendant's counterclaim for declaratory relief. It will therefore be recommended that summary judgment be denied with respect to this counterclaim.

## V. DEFENDANT'S COUNTERCLAIM FOR UDTPA VIOLATIONS

Defendant contends that plaintiff violated UDTPA in several ways and that he is entitled to summary judgment as to each. The court disagrees.

One violation defendant alleges is that the Safe Harbor website is deceptive because "the media-shifting policy stated therein is incomplete . . . . [and] [a]ny karaoke host, such as [defendant], relying upon this information will infringe upon [plaintiff's] trademarks and subject

themselves to liability." (Def.'s Mem. 15). This contention, of course, contradicts defendant's other allegation and argument that all the policy required was one-to-one correspondence between the discs. (*See* Am. Countercls. ¶ 80). This contention of deceptiveness is also contradicted by the evidence previously discussed substantiating, among other facts, that the website itself showed that the media-shifting policy required more than merely self-compliance with a one-to-one correspondence requirement; the website was not publically accessible before July 2010 when defendant admits plaintiff's main website set out additional terms of the media-shifting policy; and defendant relied on sources other than plaintiff for information about its media-shifting policy. There are accordingly genuine disputes as to material fact regarding this aspect of defendant's UDTPA claim.

Defendant also contends that plaintiff's audit policy is deceptive in that it requires karaoke hosts to delete tracks from hard drives in compliance with the one-to-one correspondence protocol when the host does not have a corresponding disc, while also providing that deletion of a track "may indicate an attempt at spoliation and constitute evidence of willful infringement, as well as trigger an audit failure." (Audit Policy (D.E. 69-4) ¶ 6.G (attached as Ex. D to defendant's original counterclaims); Am. Countercls. ¶¶ 65-69). Among other genuine disputes as to material fact, there is a question whether defendant was even injured by this audit policy. For example, he alleges that the version of the media-shifting policy on which he relied did not make provision for any audit. (*See* Am. Countercls. ¶¶ 26, 27, 80, 81). Defendant also admits that he did not submit to an audit by plaintiff. (*Id.* ¶¶ 65, 69). He points to no evidence that plaintiff deems him to have engaged in infringement based on his deletion of tracks from a hard drive. Further, defendant's own allegations show that plaintiff effectively disclosed to him that evidence of deleted tracks discovered in an audit could be deemed by plaintiff as a sign of

21

infringement. Thus, the record shows no surprise to defendant. In addition, the policy, as described in the audit policy statement defendant himself submitted with his counterclaims, did not mandate an inference of infringement from signs of deletion, but provided simply that such deleted track files "may" indicate willful infringement. (Audit Policy ¶ 6.G).

Defendant suggests that he was injured by this provision because, as a result of it, he rejected submission to an audit after commencement of this litigation and has had to continue to litigate. (Def.'s Mem. 16-17). But the letter from his attorney to plaintiff's counsel setting out his demands for any audit makes no objection to plaintiff's deeming signs of track file deletion evidence of possible infringement. (25 Mar. 2011 Ltr. from Def.'s Counsel to Pl.'s Counsel (D.E. 95-1 at 11-13) (attached as Ex. C to Pl.'s 1st Aff.)).[13] Defendant has also not adduced evidence that had he submitted to an audit, the audit would have been successful and effected the termination of the claims against him. (*See* 28 Mar. 2011 Ltr. from Pl.'s Counsel to Def.'s Counsel (D.E. 95-1 at 14) (attached as Ex. D to Pl.'s 1st Aff.) (stating that plaintiff's practice is dismissal after a successful audit)). The evidence of defendant's purchase of a large number of plaintiff's discs in July 2010 raises a question whether any audit would have been successful.

Defendant argues that plaintiff also violated UDTPA through its use of investigators. First, he alleges that plaintiff wrongfully retained persons to perform private investigative services who did not have the license required under N.C. Gen. Stat. § 74C-2(a). (*See* Am. Countercls. ¶¶ 50, 52, 97). One deficiency with this contention is that defendant makes it on information and belief, not personal knowledge. (*See id.* ¶ 52). Defendant has therefore not properly raised the issue for determination on his motion. *See* Fed. R. Civ. P. 56(c)(4).

---

[13] Defendant's statement in his first affidavit authenticating this letter and the letter in response, which is cited in the text directly below (*see* Pl.'s 1st Aff. ¶ 32), are admissible as statements of a party opponent under Fed. R. Ev. 801(d)(2)(A).

The contention also fails on the merits. Plaintiff's counsel, Harrington, states in his declaration that he hires investigators who work for him, including Millius, in his representation of plaintiff. (Harrington Decl. ¶¶ 5, 6). As agents of an attorney, such investigators are exempt from licensure as private detectives or investigators. *See* N.C. Gen. Stat. § 74C-3(b)(4).

Harrington does not state in his declaration that Jennifer Price worked for him, although Slep's deposition testimony suggests that she did. (Slep Dep. 68:18 to 69:2). Defendant alleges that she (and others) provided surveillance services "for Slep-Tone *or its agents* on a contractual basis." (Am. Countercls. ¶ 50 (emphasis added)). Its agents could, of course, include its counsel. Thus, the record does not preclude the possibility that Jennifer Price and any other investigators were also exempt from licensure under N.C. Gen. Stat. § 74C-3(b)(4).

Second, defendant argues that plaintiff is improperly hiring and compensating the investigators to furnish evidence to be used before a court of law and that, to the extent done through its counsel, this practice raises ethical questions for its counsel under Rule 3.4(b) of the Revised Rules of Professional Conduct of the North Carolina State Bar. (*See* Am. Countercls. ¶ 51). This allegation as well is made on information and belief, and therefore does not properly raise the issue.

In any event, Harrington states in his declaration that he uses investigators for pretrial investigation. (Harrington Decl. ¶ 7). With respect to Millius specifically, he elaborates that "[n]either Slep-Tone nor I have ever offered Mr. Millius any inducement to provide testimony, false or otherwise, nor has Mr. Millius been paid anything other than a reasonable fee for his services and reimbursement for his expenses incurred." (*Id.* ¶ 8). As to Jennifer Price, Slep testified at his deposition that "I know we have never paid her . . . . [and] I don't believe Mr. Harrington paid her." (Slep Dep. 69:5-8).

23

Defendant has not adduced evidence to the contrary with respect to either Millius or Jennifer Price. Nor has he adduced competent evidence otherwise showing that plaintiff or its counsel has improperly compensated investigators for their testimony.

Lastly, defendant contends that plaintiff violated UDTPA by Fine's August 2010 mailing to him of the unfiled complaint bearing a case number without any accompanying letter or other explanation. (*See* Am. Countercls. ¶¶ 57, 58, 98). Defendant contends that, aside from any other improprieties, the mailing constituted three separate crimes: obtaining property by false pretenses in violation of N.C. Gen. Stat. § 14-100; simulation of court process in connection with collection of a claim or demand in violation of N.C. Gen. Stat. § 14-118.1; and mail fraud in violation of 18 U.S.C. § 1341.

Central to defendant's argument is that inclusion of a case number in the caption amounted to a misrepresentation that the complaint had actually been filed, although there is no stamp from the court indicating the complaint was filed and the complaint is not signed. In any event, the exemption in UDTPA for "professional services rendered by a member of a learned profession," which includes legal services, applies to the sending of the complaint. N.C. Gen. Stat. § 75-1.1(b); *Reid v. Ayers*, 138 N.C. App. 261, 266, 531 S.E.2d 231, 235 (2000) (holding the practice of law to be a learned profession under § 75-1.1(b)). Even absent application of the exemption, North Carolina case law suggests that the communication is neither unfair nor deceptive as a matter of law given the strong public policy favoring freedom of communication by attorneys. *See Harris v. NCNB Nat. Bank of N.C.*, 85 N.C. App. 669, 676-77, 355 S.E.2d 838, 844 (1987) (holding that the act of defendant's counsel sending a proposed complaint with a letter of demand to counsel for plaintiff's employer, a party involved in the claim at issue, in anticipation of litigation was neither unfair or deceptive as a matter of law under UDTPA in light

of "the strong public policy favoring freedom of communication between parties and their attorneys with respect to anticipated or pending litigation").

The court concludes that defendant is not entitled to summary judgment on his claim under UDTPA. It will therefore be recommended that defendant's motion be denied with respect to that claim.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that defendant's motion for partial summary judgment (D.E. 94) be DENIED in its entirety.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have until 16 April 2014 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections are due no later than 14 days from service of the objections or 30 April 2014, whichever is earlier.

SO ORDERED, this 2nd day of April 2014.

James E. Gates
United States Magistrate Judge